IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:14-CV-00521-FL

| | |
|---|---|
| JUDITH GEE, for S.G., *a minor*, ) | |
| ) | |
| Plaintiff/Claimant, ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-21, -23] pursuant to Fed. R. Civ. P. 12(c). This action was filed by Judith Gee on behalf of S.G., her minor son, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his application for Supplemental Security Income ("SSI"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

An application for SSI was filed on behalf of Claimant on September 25, 2009, alleging disability beginning April 15, 2009. (R. 19, 222-24). The claim was denied initially and upon reconsideration. (R. 98-115). A hearing before an Administrative Law Judge ("ALJ"), Ralph P. Dodds, was held on April 5, 2011 (R. 37-75), and on May 23, 2011, the ALJ issued a decision denying Claimant's request for benefits (R. 116-32). On August 30, 2012, the Appeals Council

remanded the case for consideration of new evidence presented to the Appeals Council. (R. 133-35). On October 10, 2013, ALJ Katherine D. Wisz held a hearing at which Claimant, represented by counsel, and Claimant's mother, Judith Gee, appeared and testified. (R. 76-97). On November 8, 2013, the ALJ issued a decision denying Claimant's request for benefits. (R. 16-34). On July 17, 2014, the Appeals Council denied a request for review of the ALJ's decision. (R. 1-5). A complaint was then filed on behalf of Claimant in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial

2

evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Social Security regulations provide a three-step sequential evaluation process for determining whether a minor is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is not disabled. *Id.* § 416.924(a), (b). Next, the ALJ must determine whether the claimant suffers from "an impairment or combination of impairments that is severe"; if not, the claimant is not disabled. *Id.* § 416.924(a), (c). If an impairment is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then it is not severe. *Id.* § 416.924(c). If the claimant has a severe impairment, the analysis progresses to step three where the ALJ must consider whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listing. *Id.* § 416.924(a), (d). If the claimant has such an impairment, and it meets the duration requirement, the claimant is disabled. *Id.*

In this case, Gee alleges the ALJ erred in determining Claimant's impairments do not functionally equal a listing. Pl.'s Mem. [DE-22] at 5-7.

3

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since the application date. (R. 22). Next, the ALJ determined Claimant had the following severe impairments: attention deficit hyperactivity disorder ("ADHD"), autism spectrum disorder, and asthma. *Id.* However, at step three, the ALJ concluded these impairments, individually or in combination, do not meet, medically equal, or functionally equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22-34).

### B. Claimant's Testimony at the October 10, 2013 Administrative Hearing

At the time of the October 10, 2013 administrative hearing, Claimant was 12 years old, being home schooled by his mother, and studying sixth-grade material. (R. 81-82). Claimant's favorite subject is math and as part of his school work he studies times tables, addition, subtraction, and division. (R. 82). Claimant's favorite activity is playing computer games and he also plays outside, rides bikes, and plays video games with friends. (R. 83). Claimant is not involved in sports teams, clubs, or other group activities. *Id.* Claimant is shy with strangers and has the most difficulty talking to people. (R. 84). Claimant uses an albuterol inhaler twice daily for asthma and takes an allergy pill, which makes him feel better. *Id.* Claimant recalled using a nebulizer at the hospital, but could not remember ever having an asthma attack. (R. 85).

### C. Judith Gee's Testimony at the October 10, 2013 Administrative Hearing

Judith Gee, Claimant's mother, testified as follows at the administrative hearing. (R. 85-96). Claimant was diagnosed with autism, in the mid-range of the scale, and with ADHD, although the

4

ADHD is difficult to differentiate from the autism. (R. 87). Claimant has a math learning disability and, at the time of the administrative hearing, was between a third- and fourth-grade level in math, but was on a sixth-grade level for vocabulary and other subjects. (R. 86). Gee works on simple things with Claimant, like reading a clock, but he continues to struggle and she has to repeat things over and over. (R. 89-90). He may learn something they work on every day for a week, such as spelling words, but cannot retain the information and would not be able to spell most of the words the following week. (R. 89).

Claimant has a particularly difficult time learning in a school setting, where he is distracted by things such as the fluorescent lights, rustling of paper, and murmuring of other children, which prevent him from completing his work. (R. 87). Claimant learns much better visually, but has difficulty conveying what he knows either verbally or on paper. *Id.* Claimant had to do school work at night and on Saturdays to try and stay on grade level, but he couldn't keep up. *Id.* Claimant had an individualized education program ("IEP") in school, which included individualized instruction in math, reading, and another course Gee could not remember. (R. 90). Claimant also received accommodations for testing, such as questions being read to him to keep him on track. *Id.* Due to his inability to focus, Claimant was also being singled out by his teacher and separated from his classmates. (R. 87-88). For example, Claimant's desk was separated from the other students, who sat in groups, and Claimant faced the blackboard because the teacher said it was the only way she could control him and keep his focused. (R. 88). Claimant was unintentionally disruptive, and Gee would receive notes from the teacher three to four times a week regarding his behavior. (R. 91). Eventually, Gee began home schooling Claimant because she did not want him to be labeled as a problem child and he was going to be held back. *Id.*

5

Children also made fun of Claimant because he could not keep up emotionally. (R. 88). Although he had a few friends in school, other children thought it was funny to tease Claimant because he was gullible. (R. 91). Claimant's neighborhood friends are seven and eight years old. (R. 88). Claimant does fairly well with authority figures, tries to get along well with others, and generally does so. (R. 91). Claimant had more social problems when he was younger and he was a difficult infant, not wanting to be held; Gee had difficulty placing him in a day care due to his problems. (R. 91-92).

Claimant also suffers from asthma. Gee indicated Claimant was "doing all right" with his asthma, but generally has problems in allergy season and through the winter. (R. 93). Claimant last had an asthma attack six months prior to the hearing. *Id.* He uses an inhaler twice daily, but Gee has to remind him and instruct him how to use it because he cannot remember. *Id.* Gee has to watch Claimant for signs his asthma is flaring, because Claimant will not communicate that he is having problems. (R. 93-94).

Claimant dresses himself, but Gee was bathing Claimant until he was 10 years old. (R. 94). Gee has to lay out everything for Claimant and remind him to wash his hair first, etc. *Id.* Claimant is impulsive and does not stop and think things through, so Gee has to watch him closely. *Id.* For example, Claimant almost walked out in front of a car. *Id.* Claimant can make cereal for himself and does help in the kitchen. (R. 95). However, while Claimant can unload the dish washer, he can only do so if items are in a precise location, i.e., if a dish is out of place, he will not know what to do with it. *Id.* Claimant is reliant on a schedule and reacts poorly to change in routine with tantrums. (R. 95-96).

6

Case 5:14-cv-00521-FL   Document 26   Filed 08/12/15   Page 6 of 19

## V. DISCUSSION

The issue presented here is whether Claimant's impairments functionally equal a listing and, specifically, whether Claimant's autism causes a marked limitation in his ability to acquire and use information. Pl.'s Mem. [DE-22] at 5-7. The ALJ found Claimant has a "marked limitation" in attending and completing tasks and a "less than marked" limitation with respect to the remaining five domains. (R. 29-34). Gee contends, however, that Claimant also has a marked limitation in acquiring and using information and, in support, relies on Claimant's math calculation test scores and Gee's testimony indicating Claimant has difficulty with math and conveying what he has learned. Pl.'s Mem. [DE-22] at 5-7. The Commissioner contends substantial evidence supports the ALJ's finding of a less than marked limitation in the domain of acquiring and using information. Def.'s Mem. [DE-24] at 6-10.

If a minor's impairments do not meet or medically equal a listing, the ALJ must determine whether there is functional equivalency. 20 C.F.R. § 416.926a(a). In making this determination, the ALJ considers how a claimant functions in terms of six "domains," which are "broad areas of functioning intended to capture all of what a child can and cannot do." *Id.* § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) self-care; and (6) health and physical well-being. *Id.* § 416.926a(b)(1)(i)-(vi). A finding of functional equivalence requires either "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(d). A "marked" limitation is defined, in relevant part, as follows:

> (i) [Y]our impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and

7

cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
. . .

(iii) [Y]ou have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

*Id.* § 416.926a(e)(2)(i), (iii). The ALJ may not rely on any test score alone, but rather will consider the score "together with the other information . . . about [the claimant's] functioning, including reports of classroom performance and the observations of school personnel and others." *Id.* § 416.926a(e)(4)(i)-(ii). For example, if the claimant has "a valid IQ score below the level in paragraph (e)(2), but other evidence shows [the claimant has] learned to drive a car, shop independently, and read books near [the] expected grade level," the ALJ may find the claimant does not have a "marked" or "extreme" limitation. *Id.* § 416.926a(e)(4)(ii)(B). When the ALJ does not rely on test scores, she must explain the reasons for not doing so. *Id.* § 416.926a(e)(4)(iii)(B).

With respect to the domain at issue here, acquiring and using information, the regulations provide the following guidance:

School-age children (age 6 to attainment of age 12). When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.
. . . .

8

> The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one. As in any case, your limitations must result from your medically determinable impairment(s). However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.
>
>> (i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.
>>
>> (ii) You cannot rhyme words or the sounds in words.
>>
>> (iii) You have difficulty recalling important things you learned in school yesterday.
>>
>> (iv) You have difficulty solving mathematics questions or computing arithmetic answers.
>>
>> (v) You talk only in short, simple sentences and have difficulty explaining what you mean.

*Id.* § 416.926a(g)(2)(iv), (3).

Here, in challenging the ALJ's decision regarding Claimant's functioning in the domain of acquiring and using information, Gee argues that Claimant's math calculation score (in the first percentile) and his overall academic fluency score (in the second percentile) on the Woodcock Johnson III Tests of Achievement ("WJ-III") administered by Dr. James Smith, Psy.D., are more than two standard deviations below the mean and "should be enough to trigger tougher scrutiny when assessing [Claimant's] abilities in the domain of acquiring and using information." Pl.'s Mem. [DE-22] at 5-6. Gee asserts the ALJ mentioned these test scores only in passing, noting they are "below average," and that the ALJ erred in giving Dr. Smith's assessment "little weight" because it was
9

based on reports from family members, when in fact it was based on the WJ-III, which is an objective test. *Id.* Gee also asserts her testimony that Claimant had great difficulty in math, and in learning and conveying what he had learned, supports a finding of marked limitation. *Id.* Finally, Gee notes that Claimant's IEP indicates he struggled with written expression. *Id.*

## A. Test Scores

The ALJ addressed Dr. Smith's August 1, 2011 consultative opinion,[1] which contained the test scores at issue as follows:

> Smith noted the reports from the claimant's mother indicating the claimant's attention span was "less than optimal" and that he took more time to process academic tasks than is normal for children his age. She also noted the claimant showed "some anxiety and agitation when his routine is disrupted, but is overall re-directable without serious behavioral problems." Dr. Smith administered the Woodcock-Johnson [III] Tests of Achievement (WJIII), the Wechsler Intelligence Scale for Children- 4th Edition (WISC), the Childhood Autism Rating Scale (CARS), and the ADHD Symptoms Rating Scale (ASRS). The claimant's scores on the WJIII showed average scores in broad reading and academic skills, with below average scores in math and academic fluency. He had average IQ scores, with a significantly lower subscore in processing speed (this subscore was 80, while his other subscores were between 99 and 106, and his full scale IQ score was 99). The CARS forms, completed by the claimant's mother and grandmother, indicated the claimant was in the range of "Severe Autism," but the forms they completed for the ASRS were not sufficient for an ADHD diagnosis. Based on that testing, Dr. Smith diagnosed the claimant with autistic disorder and learning disorder in mathematics. At the end of his report, Dr. Smith included a paragraph with generalized statements regarding the communicative and other difficulties experienced by persons with autism generally; however, this paragraph did not include specific limitations the claimant had and none of these opinions appeared to address him specifically (Exhibit 5F).

> Dr. Smith's assessment is given little weight. The undersigned notes that the testing performed by Dr. Smith composed of testing completed during the examination, and not based solely on subjective, uncorroborated reports from his mother and

---

[1] There appears to be no opinion from a treating physician in the record, and Claimant does not argue that the ALJ failed to follow the regulations in evaluating the medical opinions of record from the examining and non-examining consulting physicians. Rather, the error alleged relates to the ALJ's failure to properly evaluate the scores from a test administered by Dr. Smith.

10

grandmother, showed average IQ with a deficit in processing speed, and some math and academic achievement difficulties that were below average, but not severe. His "severe" autism diagnosis appears to have been based solely on the subjective, unverified reports from his mother and grandmother. Because this diagnosis and the generalized opinions at the end of his letter are not consistent with the claimant's performance in school and noted behavior, and because the undersigned has given little weight to the statements from the claimant's mother (discussed in detail below), the undersigned gives little weight to Dr. Smith's autism-related opinions.

(R. 26-27).

Gee correctly points out that Claimant's math and academic fluency scores on the WJ-III, in the first and second percentiles respectively, reflect more than two standard deviations below the mean. *See McClain v. Barnhart*, 299 F. Supp. 2d 309, 325 (S.D.N.Y. 2004) ("A score at or below the first percentile satisfies the SSA's regulatory definition of a marked limitation, since the bottom 2.3 percent of any population is more than two [standard deviations] below the mean.") (citing *Duran v. Barnhart*, No. 01-CIV-8307-GWG, 2003 WL 103003, *10 (S.D.N.Y. Jan. 13, 2003) (unpublished)). However, even assuming the ALJ's characterization of these scores as "below average, but not severe" (R. 27) fails to account for their potential significance under 20 C.F.R. § 416.926a(e)(2)(i), (iii), test scores alone are insufficient to support a finding that Claimant has a marked limitation. Rather, Claimant must possess "a valid score that is two standard deviations or more below the mean . . . and [] day-to-day functioning in domain-related activities [that] is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii). The ALJ must consider the scores "together with the other information . . . about [the claimant's] functioning, including reports of classroom performance and the observations of school personnel and others." *Id.* § 416.926a(e)(4)(i)-(ii).

First, with respect to test scores, the WJ-III was not the only test administered by Dr. Smith.

11

As the ALJ noted, on the Wechsler Intelligence Scale for Children - Fourth Edition ("WISC-IV"), Claimant demonstrated "average" IQ scores in all areas except processing speed, in which his IQ is "low average"; Claimant's Full Scale IQ of 99 is also average.[2] (R. 27, 615); *Johnson ex rel. A.J. v. Astrue*, No. 11-CIV-5247-JMF, 2013 WL 1187436, at *13-14 (S.D.N.Y. Mar. 22, 2013) (unpublished) (finding PLS-4 test score between two and three standard deviations below the mean was not sufficient alone to find a marked limitation in a domain and noting the claimant achieved a Full Scale IQ of 80, reflecting low average functioning, experienced general improvement in speech language, and evidence from claimant's pediatrician and consulting reviewers supporting absence of marked limitation in acquiring and using information); *Monk ex rel. E.M. v. Astrue*, No. 4:11CV00036, 2012 WL 2044814, at *3 (W.D. Va. May 9, 2012) (unpublished) (finding ALJ's failure to explicitly consider WJ-III scores indicating claimant was below grade level in several areas was "insufficient to undermine the balance of the substantial evidence in the record supporting the [ALJ's] finding" where, among other things, claimant generally performed well in school, progressed between grades, and averaged C's and above in all classes except math), *adopted by* 2012 WL 4459109 (W.D. Va. June 5, 2012). The ALJ also considered that the test Dr. Smith relied on specific to autism (The Childhood Autism Rating Scale ("CARS")), which placed Claimant in the range of "Severe Autism," was completed by Gee and Claimant's grandmother. (R. 27, 615).

As discussed in detail below, the ALJ attributed little weight to certain statements by Gee regarding the nature and extent of Claimant's symptoms and, resultantly, little weight to Dr. Smith's

---

[2] In March 2009, Claimant was administered the WISC-IV by the school psychological services department and achieved scores in the range of "Average" in Verbal Comprehension, Working Memory, and Full Scale IQ, which was 105, "High Average" in Perceptual Reasoning and General Ability, and "Low Average" in Processing Speed. (R. 273-75). The evaluator noted Claimant's processing speed deficit was consistent with his diagnosis of ADHD, and that numerous comments by Gee indicate behavioral concerns that could possibly be related to Autism Spectrum Disorder. (R. 277).

12

opinion based in part on Gee's reports. (R. 28, 615); *see Craig*, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). Additionally, in finding Claimant has a "less than marked" limitation in acquiring and using information, the ALJ evaluated other appropriate information, in accordance with § 416.926a(e)(4)(i)-(ii), including Claimant's largely average grades in school, the "very limited" specialized education assistance he received in writing, earlier statements from Claimant's mother, the assessment of Ashly Weeks, M.A., and the State Agency assessments (R. 29-30). Thus, any error in the ALJ's evaluation of Claimant's math and academic fluency scores on the WJ-III is harmless, where the other information about Claimant's functioning does not support a finding of marked limitation in the domain of acquiring and using information.

## B.    Credibility

The ALJ's credibility assessment regarding Gee's statements as to Claimant's functioning is integral to the determination that Claimant has a less than marked limitation in acquiring and using information. "If the claimant is a child who does not describe, or cannot adequately describe, his symptoms, the ALJ 'will accept as a statement of [the child's] symptom(s) the description given by the person who is most familiar with [the child], such as a parent, other relative, or guardian.'" *Barnes ex rel. T.J. v. Colvin*, No. 4:12-CV-254-D, 2014 WL 126039, at *4 (E.D.N.C. Jan. 13, 2014) (unpublished) (quoting 20 C.F.R. § 416.928(a)). "The ALJ must make specific findings concerning the credibility of the [caregiver's] testimony, just as he would if the child were testifying." *Id.* (quoting *Dew ex rel. K.W. v. Colvin*, No. 4:12-CV-129-D, 2013 WL 4523617, at *8 (E.D.N.C. Aug. 27, 2013) (unpublished)).

Here, the ALJ acknowledged Gee's testimony that Claimant has learning disabilities in the

13

areas of math and language, learns much better visually than verbally, struggles with communication due to his language difficulties, struggles to express his thoughts with either written or oral language, and that even in a home-schooling environment Claimant struggles with retaining information and with math generally. (R. 23-24). However, the ALJ also observed that in Gee's earliest statements submitted to the Social Security Administration, contained in Exhibit 2E and dated October 20, 2009 (R. 242-51), Gee noted very few abnormalities or limitations of functioning. (R. 28). For example, in response to a question regarding Claimant's ability to communicate, Gee checked boxes indicating Claimant could deliver telephone messages, repeat stories he has heard, tell jokes or riddles accurately, explain why he did something, and talk with family and friends. (R. 245). Gee indicated Claimant could not use sentences with "because," "what if," or "should have been." *Id.* In response to a question regarding Claimant's ability to progress in learning, Gee checked boxes indicating Claimant could read capital and small letters, read simple words, read and understand simple sentences and stories in books or magazines, print his name and some letters, spell most three to four letter words, add and subtract numbers over ten, knows the days of the week and months or the year, understands money and can make correct change, and can tell time. (R. 246). Gee indicated Claimant could not write in script or write a simple story with six to seven sentences. *Id.*

Gee's responses are not indicative of a marked limitation in the domain of acquiring and using information. Furthermore, as the ALJ observed, Gee's earlier responses conflict with Gee's later statements, contained in Exhibits 6E and 9E, alleging Claimant had very severe symptoms. *See* (R. 283-85) (remarks by Gee dated Mar. 3, 2010 describing Claimant as struggling everyday and having difficulty relating to people because he cannot relate his thoughts and feelings); (R. 297-304) (questionnaire completed by Gee and received by the SSA in July 2010, indicating Claimant has

14

debilitating asthma and struggled in school, barely passing each year). The ALJ also found these later statements by Gee regarding Claimant's impairments to be unsupported by Gee's reports to pediatric care providers or school sources. (R. 28).

In considering Claimant's school records, the ALJ noted that while Claimant's grades from kindergarten and first grade showed "some difficulties with academic and social performance," Claimant missed 41 days of kindergarten, which could contribute to his "diminished performance." (R. 25, 262, 281). The ALJ reasoned that Claimant's "performance in all realms improved according to report cards and other notes from first and second grade" and "by the last marking period of second grade, the claimant received 'S' and '3' marks (satisfactory and meets expectations, respectively) in nearly all areas of academic and other evaluation." (R. 25, 263-64). The ALJ also noted that while Claimant had an IEP in second grade, it provided "only for one hour of specialized writing instruction each day and test-taking adjustments such as additional time, placement in a quiet room, and ability to write in the test booklet," and Claimant spent "more than 80 percent of his class time with nondisabled peers, the least intensive level of specialized education." (R. 25, 265-72).

In considering Claimant's pediatric medical records, the ALJ noted the following: Gee reported during a November 6, 2009 treatment visit that the Claimant was doing well on the medication with no side effects and was doing well in school (R. 534); after the November 6, 2009 visit, Claimant's pediatric treatment notes do not contain mention of any significant mental or behavioral issues or concerns (R. 638-49); during the Claimant's 9-year-old physical on September 15, 2010, Gee indicated Claimant had achieved basic writing, reading, and spelling skills, participated in group activities, had good peer interactions, and had hobbies/played sports (R. 650-53); treatment visits from the remainder of 2010 and all of 2011 have no mention of behavioral or

mental health issues, and no indication of an autism spectrum diagnosis (R. 658-67); at Claimant's 11-year-old physical on October 22, 2012, Gee reported that Claimant was "home schooled, doing well, [in] 5th grade, [with] social activities as well" (R. 671); treatment notes from Claimant's pediatric care providers from the remainder of 2012 and into 2013 note no behavioral or mental health issues (R. 675-83); and treatment notes from Claimant's most recent pediatric care visit in September 2013, show a new diagnosis for autism but mention no specific issues and contain no treatment recommendations for that impairment (R. 684-89). (R. 25); *see also* (R. 396) (Jan. 23, 2009, 7-year physical, Claimant noted to be "on grade level"); (R. 422) (Dec. 18, 2007, 6-year physical, Claimant noted to be "1st grader, doing well, may have a little problem staying focused and easily distracted, but happy & doing grade level work, no discipline problems in class); (R. 542) (Aug. 26, 2009, noting Claimant was "home schooling this year, did well last year in second grade). While there are some treatment notes from early 2009 reflecting Claimant was having behavioral difficulty in school (R. 554-79), they are prior to Claimant being placed on medication for his ADHD and the subsequent treatment notes cited above do not reflect such concerns.

The ALJ considered Gee's statements regarding Claimant's impairments, but noted inconsistencies between Gee's own statements of record, as well as between Gee's statements and pediatric and school records, and discounted Gee's testimony accordingly. *See Barnes*, 2014 WL 126039, at *5 (finding no error in the ALJ's credibility assessment of claimant's mother's testimony where the ALJ noted the inconsistencies between the mother's statements on various function reports and between the mother's statements and those of claimant's teachers, and also noted that the mother admitted to not disciplining or setting boundaries with the claimant). Thus, the ALJ did not err in concluding that Gee's statements regarding the severity of Claimant's impairments do not support

16

a finding of marked limitation in acquiring and using information.

## C.     Other Evidence

In addition to the ALJ's consideration of the information discussed above, the ALJ cited the May 3, 2010 consultative examination of Ashly Weeks, M.A. regarding Claimant's mental functioning. (R. 26, 597-601). The ALJ gave "very significant weight" to Weeks' opinion in which Weeks reported that Claimant was able to recite five digits forward and three digits backwards in digit-span testing, recalled four out of four objects after a five-minute delay, and performed simple calculations within normal limits. *Id.* A questionnaire completed by Gee at Claimant's appointment with Weeks indicated Claimant had very severe ADHD, but adequate adaptive functioning. *Id.* Weeks assessed a Global Assessment of Functioning score of 68, indicative of mild symptoms or some difficulty in social or school functioning, and concluded Claimant did not appear to be limited in the areas of cognition or motor skills, but may have been limited socially by his tendency to respond impulsively in social situations. *Id.* The ALJ noted Weeks' findings were adopted by the supervising psychologist E.J. Burgess, Psy.D. *Id.* The ALJ found Weeks' opinion supported by the performance tests she administered and school records reflecting Claimant had only relatively minor difficulties. *Id.*

The ALJ also cited the State Agency consultants' opinions in support of her decision. (R. 28, 98-104, 106-14). The ALJ found these opinions to be generally "consistent with the claimant's school performance, the reports from the claimant's mother to pediatric care providers and those providers' observations, and the assessment from Ms. Weeks." (R. 28). However, regarding the domain of attending and completing tasks, the ALJ found their opinions that this limitation is "less than marked" not supported by the evidence of record, such as statements and observations from

17

school sources, Gee, treating sources, and evaluating sources, which all indicated Claimant had significant issues with inattention, task completion, and talkativeness, warranting a marked limitation in this domain. (R. 28-29). Gee points to no error in the ALJ's analysis of these opinions or Weeks' opinion.

The ALJ's decision reflects that she appropriately considered other evidence of record—Claimant's school and medical records, statements from Gee, and the opinion evidence—indicating Claimant does not have a marked limitation in acquiring and using information despite his low WJ-III scores in math and academic fluency. Where the ALJ appropriately considered all the evidence, sufficiently explained her reasoning, and cited to substantial evidence in the record to support her conclusion that Claimant's functioning in the domain of acquiring and using information was less than marked, there is no error.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Gee's Motion for Judgment on the Pleadings [DE-21] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-23] be ALLOWED, and the final decision of the Commissioner be upheld.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **August 26, 2015** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

SUBMITTED, this the 12 day of August 2015.

Robert B. Jones, Jr.
United States Magistrate Judge